UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JAMES DIESING,

        Plaintiff,

  v.

                               MEMORANDUM OPINION
                                  AND ORDER
                   Civil File No. 05-2540 (MJD/RLE)

BEST BUY CORPORATION,

        Defendant.

---

Steve G. Heikens, Counsel for Plaintiff.

Charles O. Lentz, Robins Kaplan Miller & Ciresi, LLP, Counsel for Defendant.

---

## I.    INTRODUCTION

Before the Court is Defendant Best Buy Corporation's ("Best Buy") Motion for Summary Judgment.[1]

## II.   BACKGROUND

This age discrimination case arises out of the termination of Plaintiff James Diesing's employment with Best Buy Corporation.  Diesing began work at Best Buy as a Regional Recruiter, focusing on field retail operations, in July 1999.  Diesing Dep. 11.  Born on June 16, 1951, Diesing was 48 years of age when he was hired.

---

[1] Initially, Plaintiff made allegations of both retaliation and breach of contract, but is no longer pursuing these claims (Plaintiff's Mem. Opp. Mot. Summ. J., p. 2).  Only the age discrimination claims remain.

Id. 8, 11.  Diesing's early work was praised by his superiors, and in August 2002, in

recognition of his successes, he was promoted to the position of Senior Recruiter,

where he specialized in recruiting candidates for high level retail management

positions.   Hendricks Dep. 62-64; Diesing Dep. 11, 13-14.  He was 51 years old at

the time of this promotion.

As a Senior Recruiter, Diesing reported to David Sisson, the Senior Director

of Human Resources, and James Malina, the Regional Human Resources

Manager.  In the fall of 2002, David Sisson asked Diesing to compile information

on all District Managers, including *age*, salary and tenure.  Diesing Dep. 161-65.

Sisson maintains that he asked for this information as a tool to help Diesing be a

more effective Senior Recruiter, although he denied requested information on

age.  Sisson Dep. 52-55.

Less than a year after Diesing was promoted, there was a hiring freeze,

followed by the restructuring of recruiting staff.  Diesing Dep. 162; Sisson Dep.

62; Hendricks Dep. 96.  As a result, the twelve Regional Recruiter positions were

eliminated, and Best Buy created the position of Divisional Recruiter in each of its

three retail divisions.  Diesing Dep. 12-13.  In February 2003, Diesing, who was

one of the four Regional Recruiters retained, was promoted to Manager of

Divisional Recruiters, responsible for supervising three recruiters and reporting to

Sisson and Malina.  Id. 13, 15, 112-115.

Diesing was 51 years old at the time of this second promotion, but was reluctant to accept the position because he did not have any managerial experience.  He informed Malina that he had some concerns about leading people and was also concerned that two of the three Divisional Recruiters who reported to him were receiving greater compensation.  Malina Dep. 62-64; Diesing Dep. 38-40.  Diesing was told that these differences in compensation were due to geographical factors and cost of living adjustments.  Id.

Almost immediately, Diesing experienced difficulty in this managerial role. He felt that the other recruiters were hostile to him and were engaged in "turf" battles.  Diesing Dep. 113-117.  Diesing believed that the younger recruiters disliked his "old style" of recruiting, which consisted of cold calls into companies. Id.  In addition, he believed that the other recruiters were being disrespectful of him and complained to Malina about the problems.  Id. 126-127.

As a result of these difficulties, three months after being promoted, Diesing was demoted.  There was no corresponding reduction in compensation, however. Malina Dep. 62-64.  Malina informed Diesing that it did not appear he could manage the recruiters anymore, and sought to place him back in a position where he could succeed.  Id.  After this demotion, from May 2003 through January 2004, it is unclear who was supervising Diesing.  At the end of this period, Diesing was supervised by Regional Human Resources Manager Mike Soderbeck and Diane

3

Lemaux, the new National Director of Field Human Resources.  Diesing Dep. 18-19, 22-23; Soderbeck Dep. 19-20, 62-65.  In April 2004, Diesing began reporting to Kristina Parker, the Senior Manager of Field Selection.  Parker Dep. 30-32, 39-40.

Immediately following his demotion, Diesing's relationships with the other recruiters did not improve and he was called to a meeting and issued a "written final warning" highlighting his failure to work cooperatively with other members of the recruiting team.  Def. Ex. I.   Diesing believes that at this meeting, he was being pressured to resign.  Specifically, he believes that Ms. Lemaux's comments that he no longer had the "pace and passion" to do his job, and that "his job was changing" and as a result, "he would no longer like it" were directed at his age.  Diesing Dep. 95-96.  Many of the criticisms that formed the basis of the warning were contradicted by his most immediate supervisor, James Malina.  Malina Dep. 65-66.

After the final warning was issued, Diesing began to receive positive feedback from his supervisors. Soderbeck Dep. 28-39.  In his May 2004 annual performance evaluation, Diesing was rated "meets expectations" and his supervisors found his performance wholly satisfactory.  Def. Ex. J, Soderbeck Dep. 65; Parker Dep. 72-73.  Diesing thought he should have been rated higher, and believes that the lower score was the result of age discrimination.  Diesing Dep. 89-93.  During his performance evaluation, Diesing asked if the December 2003

4

final warning was still in effect, and alleges that Soderbeck replied that he was on "perpetual final warning". Id. 27-28. Soderbeck does not recall using this language, but testified that a warning does not have an expiration date. Soderbeck Dep. 44-45.

On Friday, June 25, 2004, there was an incident involving Diesing and another Best Buy employee, Jeremy Monsrud, age 29, which arose out of a parking dispute. A security video captured some of the events on tape. Malone-Vestal Aff. ¶ 5; Ex. D. In addition, there are three written descriptions of the event, one each from Diesing, Monsrud, and Jeffrey Krohn, the security guard on duty. Id., ¶¶ 2,6, Exs. A, B and E.

In summary, Diesing parked his car horizontally across two spaces in a remote part of the lot. Monsrud intentionally parked in the next slot over to block Diesing's vehicle. When Diesing needed to leave for a doctor's appointment, he informed the security guard, then called the police and a towing company. Although the security guard knew it was Monsrud's car, he pretended to look for the owner, and claimed he could not find him. Krohn had found Monsrud, however, and told him Diesing would tow his car if he didn't move it. Monsrud responded "[g]ood. I want it towed, then I'll sue him for stealing my car." Diesing Ex. 6. Only after he learned that Diesing had called a towing company did Monsrud move his car. Diesing met Monsrud in the parking lot where the

5

men argued until Diesing took Monsrud by the arm and steered him toward the

Red Circle building.  Both men spoke with the security guard and Diesing was

attempting to get the guard to call someone to discipline Monsrud.  Diesing Dep.

39-41. Monsrud then attempted to leave.  Diesing wanted to stop him and

appeared to push him on the shoulder and stick out his leg as if to trip him.

Malone-Vestal Aff., Ex. D.

    As a result of these events, Monsrud was given a "final written warning".

Monsrud Dep. 64, 89-95; Diesing Ex. 6.  The security guard was also given a final

written warning for his perceived failure to take appropriate steps to either

prevent or de-escalate the conflict. M. Zambrano Aff., ¶ 4, Ex. A.  Diesing was

discharged.  He was replaced by a 22 year-old within weeks of his termination.

    On July 6, 2004,  Diesing met with his immediate supervisor, Parker, and

human resources representatives Shelley Malone-Vestal and Val Raatz.  He was

informed during this meeting that because of the incident at the Red Circle

building, he was being suspended pending an official review.  Diesing Dep. 30-36.

Later that day, Diesing was informed that his employment had been terminated.

Id.  35.  Best Buy claims that this decision was based solely on Diesing's conduct

during the Red Circle incident.  Parker Aff., ¶ 5; Malone-Vestal Aff., ¶ 7.  Best Buy

claims that Ms. Parker made this final decision on Malone Vestal's

recommendation without consulting Diesing's file. Id., ¶ 2; Id., ¶ 9.  Finally, Best

Buy claims that neither Ms. Parker nor Ms. Malone sought the input of Diesing's previous supervisors, co-workers or others as to whether discipline was appropriate under the circumstances. <u>Id</u>. 13.

On or about April 29, 2005, 297 days after the discharge, Diesing filed a Charge of Discrimination with the EEOC alleging age discrimination. Lentz Decl. ¶ 16, Ex. O; Diesing Dep.134-136.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. <u>Id</u>. at 323. If the opposing party fails to make a showing that supports the existence of an element essential to the case on which they have the burden of proof at trial, summary judgment must be granted. <u>Id</u>. at 332-33. Summary judgment should seldom be used in employment discrimination cases. <u>Crawford v. Runyon</u>, 37 F.3d 1338, 1341 (8th Cir. 1994) (citations omitted). However, summary judgment should not be viewed as a disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, designed to

secure the just, speedy and inexpensive resolution of every action. <u>Celotex Corp.</u>, 477 U.S. at 327.

### B.   ADEA and MHRA claims

Under the Age Discrimination in Employment Act, ("ADEA"), it is "unlawful for an employer…to discharge any individual…because of such individual's age." 29 U.S.C. § 623(a)(1).  The protections in the ADEA apply to individuals forty years of age and over.  <u>Id.</u>  Under the Minnesota Human Rights Act ("MHRA"), it is an unfair employment practice to discharge an individual because of that individual's age.  Minn. Stat. § 363A.03 Subd. 2(b).  In the absence of direct discrimination, both ADEA and MHRA claims are analyzed under the <u>McDonnell Douglas</u> burden shifting analysis.  <u>See</u> <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 141 (2000)(ADEA claims); <u>Hoover v. Norwest Priv. Mortg. Banking</u>, 632 N.W.2d 534, 542 (Minn. 2001)(MHRA claims).

Under <u>McDonnell Douglas</u>, the plaintiff bears the initial burden of proving a prima facie case of discrimination.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  The defendant then has the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action. <u>Id</u>  If the defendant meets this burden, the plaintiff must have the opportunity to show that the proffered reason was actually pretext for unlawful discrimination.  <u>Id</u>.

1.  Prima Facie Case

8

To prove a prima facie case of age discrimination, a plaintiff must satisfy the following four elements: (1) he is a member of the protected class, (over the age of forty); (2) he was performing his job adequately; (3) he suffered an adverse employment action; and (4) he was replaced by a younger person after the discharge.  Keathley v. Ameritech Corp., 187 F.3d 915, 920(8th Cir. 1999)(citation omitted).

> a)  Class Membership; Replacement by a Younger Person

It is not disputed that during the length of his employment relationship with Best Buy, Diesing was over the age of forty and that he was replaced by a substantially younger person after his discharge.

> b)  Adequacy of Performance

The failure to meet an employer's legitimate expectations can be grounds to find that an employee failed to present a prima facie case of discrimination. Riggs v. Kan. City Mo. Pub. Sch. Dist., 385 F.3d 1164, 1166 (8th Cir. 2005); See also: Tedla v. Potter, 2006 US Lexis 42133 (D. Minn. 2005); Erenberg v. Methodist Hospital, 240 F.Supp.2d 1022, 1031 (D. Minn. 2003), aff'd 357 F.3d 787, 793 (8th Cir. 2004).  The standard to be applied is not that of the ideal employee but rather what the employer could legitimately expect.  Keathley, 187 F.3d at 920.

Best Buy concedes that during the course of his employment, Diesing was

performing adequately.  However, Best Buy argues that because of the behavior for which he was discharged, he ultimately failed to meet the minimum requirements for employment.  Best Buy asserts that Diesing's inability or unwillingness to restrain himself during the Red Circle incident was considered a display of behavior for which there was no alternative but discharge.

Best Buy asserts that Diesing recognized the seriousness of his behavior.  In his deposition testimony, Hendricks stated that Diesing had told him over the phone that he had been involved in an altercation.  Hendricks Dep.103-104. Hendricks further stated that  Diesing was in tears, acknowledged he had made a mistake and was worried that there would be consequences.  Id. 105.  Diesing further admitted at his deposition that he "reacted regrettably out of the heat of passion…".  Diesing Dep.78.

 Diesing does not dispute that he had this conversation with Hendricks or that he expressed regret for his actions that day.  However, Diesing asserts that he was meeting Best Buy's expectations as evidenced by the fact that two months earlier, he had received a performance evaluation in which he was rated as "meets expectations."

In determining whether Diesing has met his burden of establishing this prong of a prima facie case of age discrimination, this Court must keep in mind that the burden is not intended to be onerous.  Texas Dep't of Community Affairs

v. Burdine, 450 U.S. 248, 253 (1981). Because of this low threshold, the Court

must be careful not to conflate the reasonable expectations prong into the

ultimate issue. Rodgers v. US Bank, 417 F.3d 845, 852 (8th Cir. 2005) (recognizing

conflicting lines of cases for determining when employees are "similarly situated"

and deciding to follow the "low threshold standard" for purposes of the prima

facie case). Given that he was rated "meets expectations" in his latest

performance evaluation, the Court finds that Diesing has met his burden of

establishing that he was performing his job adequately.

    *c) Adverse Employment Action*

   To constitute an adverse employment action, the employer's decision must

effect a material change in the terms and conditions of employment. Hughes v.

Stottlemyre, 454 F.3d 791, 796 (8th Cir. 2006). Best Buy recognizes that Diesing's

discharge is clearly an adverse employment action.

   2. Legitimate Non-Discriminatory Reason

   Diesing concedes that Best Buy has articulated a non-discriminatory reason

for his termination. Specifically, Best Buy maintains that Diesing was terminated

as a result of the Red Circle incident because he should have restrained himself

and not acted out in what his supervisors believed to be a physically threatening

and inappropriate way. Malone-Vestal Aff. ¶ 9; Parker Aff. ¶ 5. The burden now

shifts to Diesing to demonstrate that this proffered reason was actually pretext for age discrimination.

### 3.   Pretext

Once an employer has stated a nondiscriminatory reason for its actions, a plaintiff can only survive summary judgment if "the evidence considered in its entirety (1) create[s] a fact issue as to whether [the employer's] proffered reasons are pretextual <u>and</u> (2) create[s] a reasonable inference that age was a determinative factor in the adverse employment action." <u>Lewis v. St. Cloud State Univ.</u>, 467 F.3d 1133, 1137 (8th Cir. 2006).  This requires more than simply discrediting the employer's stated reason for the termination.  <u>Kohrt v. MidAmerican Energy Co.</u>, 364 F.3d 894, 897 (8th Cir. 2004).  The plaintiff must also prove that the proffered reason was a pretext for age discrimination. <u>Id</u>.  The real issue is whether the plaintiff was "the victim of intentional discrimination." <u>Reeves</u>, 530 U.S. at 153.

To carry this burden of showing pretext, a plaintiff must show that the proffered justification for the adverse employment action is unworthy of credence. <u>Erickson v. Farmland Industries, Inc.</u>, 271 F.3d 718, (8th Cir. 2001).  The methods which a plaintiff may use to demonstrate pretext include: (1) demonstrating that the proffered reason has no basis in fact, (2) demonstrating that the action the employer took was contrary to a policy or practice, (3) showing that it is unlikely

that the employer would have acted on the proffered reason, and (4) providing evidence of a discriminatory attitude in the workplace.  Id. at 727.  However, courts do not sit as "super personnel departments" and should not substitute their own judgment for those made by employers, except to the extent that those judgments involve intentional discrimination.  Hutson v. McDonnell-Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995).

 Diesing argues that Best Buy's proffered reason for discharging him, his behavior during the Red Circle incident, was not the real reason he was fired, and that age was more likely the real reason.  In support of this argument,  Diesing focuses on the following: (1) the delay between the behavior and the discharge demonstrates a lack of urgency; (2) the behavior was not very serious and the discipline was disproportionate; (3) there are inconsistent accounts of who was involved in the decision to terminate him and what information was considered; (4) he was replaced by someone substantially younger; (5) there is evidence of discriminatory attitude in the workplace; and (6) Best Buy had taken actions which had the effect of lowering the average age of the work force.

    The Court has thoroughly reviewed the record and finds material fact questions exist as to the real motive for Diesing's discharge.  For example, there are fact questions as to who was involved in the decision to terminate Diesing's employment.  Best Buy asserts that the decision to terminate Diesing's

employment was made by Parker, in consultation with Malone-Vestal and Raatz. Parker avers in her affidavit that she did not consult or talk with any of Diesing's prior managers, including Diane Lemaux, Mike Soderbeck, David Sisson or Jim Malina, prior to making her decision to terminate Diesing's employment. Parker Aff. ¶ 2. Yet, in his deposition, Sisson acknowledged receiving a phone call from Parker regarding Diesing's impending discipline. Sisson Dep. 89. Whether or not Parker consulted with Sisson may be relevant to Diesing's claim of discrimination given Sisson's alleged interest in improperly collecting the ages of Best Buy's managers. Diesing Aff. ¶ 7. Arguably, Sisson's concerns about age may have influenced Parker's decision to terminate his employment.

In addition, Best Buy Regional Vice President Ed Hendricks testified at his deposition that he had at least two conversations with Jim Malina about the Red Circle incident. The purpose of the phone calls was to inform Hendricks of the investigation. Hendricks Dep. 102. Yet, in describing the phone calls, Hendricks testified that Malina told him "what had occurred and why *they* were recommending termination. And based on what *they* had learned in their investigation and had viewed on this videotape, had make a recommendation for termination and wanted me to know . . ." Hendrickson Dep. 107 (emphasis added). Hendrickson further testified that Malina "didn't tell me ultimately that he was making the final decision, but that he was part of it." Id. 126. Incredibly,

14

Malina testified at his deposition that he did not know what ultimately happened to Diesing and that he had had no part in the investigation.  Malina Dep. 45.

The Court further finds a material fact question exists as to whether similarly situated employees were treated differently.  Best Buy asserts that Diesing was terminated because his conduct during the Red Circle incident was considered to be physically threatening behavior.  Parker Aff. ¶ 5.  While the other employee involved in the incident, Monsrud, did not engage in physical contact, the Court finds his misconduct was nonetheless comparable in seriousness.  See Rodgers, 417 F.3d at 853 (quoting Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972-73 (8th Cir. 1994)) ("To be probative of pretext, the misconduct of more leniently disciplined employees must of 'comparable seriousness.'")

Monsrud readily admitted that he parked his car in a way to prevent Diesing from moving his car simply because he did not like the way Diesing parked.  Lentz Decl., Ex. M.  When told by the security guard that Diesing needed Monsrud to move his car, Monsrud refused to do so.  Id.  As noted in the final warning issued to Monsrud, this response "was both inappropriate and disrespectful of the needs of a fellow employee."  Id.  He only moved his car after being informed that Diesing had called a towing company.  By telling Diesing he was trying to have a little fun with him, Monsrud escalated "an already sensitive situation."  Id.  "Jeremy's actions in this incident were both purposeful and

inflammatory, meat to elicit a reaction from a fellow employee." Id. Even though

Best Buy found that Monsrud's behavior was inappropriate and that his purposeful

conduct escalated the situation, he was given only a final warning.[2]

Based on the above, the Court finds summary judgment is not warranted.

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment

[Doc. No. 15] is DENIED.

Date: September 10, 2007

s / Michael J. Davis
Michael J. Davis
United States District Court

---

[2] The Court also notes that the record does not indicate who disciplined Monsrud. At his deposition, Monsrud testified that he did not know who made the disciplinary decision. Monsrud Dep. 89-90.